IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 18, 2021

**STATE OF TENNESSEE v. JALEEN GENARD ALLEN**

**Appeal from the Criminal Court for Knox County**
**No. 112482   G. Scott Green, Judge**

_____

**No. E2020-00632-CCA-R3-CD**

_____

The Defendant, Jaleen Genard Allen, was convicted by a Knox County Criminal Court jury of first degree premeditated murder, first degree felony murder during the perpetration of a kidnapping, especially aggravated kidnapping, a Class A felony, and employing a firearm during the commission of a dangerous felony, a Class C felony. *See* T.C.A. §§ 39-13-202 (2018) (subsequently amended) (first degree murder), 39-13-305 (2018) (especially aggravated kidnapping), 39-17-1324 (2018) (subsequently amended) (firearm violation). The trial court merged the first degree murder convictions and imposed a life sentence. The court sentenced the Defendant to twenty-five years for the especially aggravated kidnapping conviction and to six years for the firearm violation. The court ordered consecutive service, for an effective sentence of life imprisonment plus thirty-one years. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

J. Liddell Kirk (on appeal), Clinton Frazier (at trial), and Andrew Blackburn (at trial), Knoxville, Tennessee, for the appellant, Jaleen Genard Allen.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Charme Allen, District Attorney General; Hector Sanchez and Leland Price, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to an August 29, 2017 shooting, in which Michael Johnson suffered fatal gunshot wounds. At the trial, the recordings of two 9-1-1

calls were received as exhibits and played for the jury. The calls were placed on August 29 at approximately 6:15 a.m. and reported the shooting. Michael Mayes, Knox County Emergency Communications custodian of records, identified a report associated with the 9-1-1 calls and stated that one of the callers reported seeing a blue Nissan Versa or Sentra flee the scene of the shooting on Agnes Road.

Knoxville Police Sergeant Colin McLeod testified that he responded to the scene after receiving information about a shooting and someone screaming. He said that he parked his police cruiser at the end of a driveway leading to a home, walked up the steep driveway, and saw a significant amount of blood and multiple cartridge casings on the driveway. He did not see the victim at this time because it was dark but said the victim was later found deceased twenty feet down an embankment. Sergeant McLeod said that he spoke to Wanda Sharp, the homeowner, and that she was the only person inside the home.

Knoxville Police Crime Scene Technician Stephanie Housewright testified that she recovered multiple cartridge casings and bullet fragments at the scene and that a blood trail led from the driveway of the home to the victim's location down an embankment. Approximately two hundred photographs of the scene were received as exhibits, which included, in relevant part, photographs of the driveway, the victim, thirteen .40-caliber cartridge casings, five bullet fragments, a pool of blood, a blood trail and drag marks leading from the driveway to the embankment, a cigarette butt, a partially smoked cigar, a roll of duct tape, bullet holes and "defects" on the exterior of the home, a black sports bra, and a "laser pointer/sight" for a firearm. Photographs of the victim showed that he was barefoot, that he had duct tape on his left hand, that he was bloody, and that he had sustained multiple gunshot wounds. Ms. Housewright said that the tape on the victim's hand was consistent with the roll of duct tape found at the scene. She said that the victim wore a white beaded bracelet and that a bead from the bracelet was stuck to the duct tape removed from the victim's hand. Ms. Housewright stated that she did not find signs of forced entry into the home's basement and that a piece of duct tape was recovered from a table in the basement. Ms. Housewright identified three pill capsules that were found inside the basement and outside the home and said two cell phones were recovered from the basement.

Leslie Shaffer, custodian of records for Walgreens, testified that she obtained August 29, 2017 surveillance recordings from Walgreens located on Northshore Drive at the request of Knoxville Police Investigator Charles Lee. Ms. Shaffer described the contents of the recordings as they were played for the jury. The first recording reflected the inside of the store. The recording showed that at 7:22 a.m., two people entered the store, that they walked around the store, and that they left at 7:25 a.m. A recording from the parking lot camera showed the people at 7:29 a.m. Ms. Shaffer did not know the people reflected in the recordings. The recordings were received as exhibits.

Rob Levering, custodian of records for Pilot Travel Centers, testified that at the request of Knoxville Police Investigator Charles Lee, he obtained August 29, 2017 surveillance recordings from a Pilot convenience store located on Northshore Drive, which was near the Walgreens previously identified by Ms. Shaffer. Mr. Levering described the contents of the recordings as they were played for the jury. The recordings showed that a man and a woman walked inside the store and that they made a purchase. Mr. Levering stated that he obtained the receipt from the transaction and that they bought chocolate milk and duct tape at 5:54 a.m. Mr. Levering said that the man and the woman left the store at 5:56 a.m. The receipt and the recording were received as exhibits.

On cross-examination, Mr. Levering identified a recording depicting the parking lot of the convenience store. Mr. Levering said that a "dark gray, silver, nighttime color[]" car entered the parking lot at 5:50 a.m. and that two people left the car.

Leslie Hunt testified that she and Michael Clayton were at Mr. Clayton's home where the shooting occurred during the early morning hours of August 29, 2017.[1] She said that the Defendant arrived at the home to "come and serve us some drugs." She said that the Defendant asked if they knew the victim's whereabouts, that she became confused because the victim stood behind the Defendant, that she told the Defendant the victim stood "right there," and that the Defendant instructed Mr. Clayton and "some other female to go get some duct tape and some other items." Ms. Hunt said that the Defendant had a black gun with a pink extended magazine "hanging on his neck" from a lanyard and that the Defendant pointed the gun at Mr. Clayton when the Defendant instructed Mr. Clayton to obtain the duct tape. Ms. Hunt did not know the woman who went with Mr. Clayton to purchase duct tape.

Ms. Hunt testified that while Mr. Clayton and the woman were gone from the home, the Defendant "taunted" the victim with a laser while the victim slept on a couch in the basement. Ms. Hunt did not recall the Defendant's specific words but stated the Defendant said something "like eeny, meeny, miny, Jones" while pointing the firearm's laser "back and forth."[2] Ms. Hunt recalled that the Defendant mentioned "something about [the victim's] stealing one of his homies' cars." Ms. Hunt said that Mr. Clayton and the unidentified woman returned to the home after approximately fifteen minutes, that the Defendant "put a gun to" Mr. Clayton, and that the Defendant "order[ed]" Mr. Clayton to "duct tape" the victim while the victim slept. Ms. Hunt said that Mr. Clayton complied but that the Defendant intervened because the Defendant thought the duct tape was too loose.

---

[1] The record reflects the witness's name as Leslie Hunt, Lacie Hunt, and Sierra Hunt. We use Leslie Hunt for consistency.

[2] Other evidence shows that the victim was known as Michael Johnson and Michael Jones.

She said that the victim awoke after the victim was "duct taped and pulled up." When asked if the Defendant pointed a gun at her, she said the gun "was waved around." She said that she and the unidentified woman were told to enter the bathroom and later told to go to the Defendant's car. She said that after she entered the Defendant's car, she heard the Defendant talk to the victim, that she heard the victim say, "[N]o, no, no," and that she heard gunshots. She said that the victim's hands and feet were bound by duct tape and that a black sports bra covered the victim's head. She recalled that initially, duct tape covered the victim's mouth but said that it was removed before the shooting.

Ms. Hunt testified that although she was inside the car when the shooting occurred, she was only about three feet from the victim and that she watched him die. She did not recall the number of times the victim was shot but said the victim screamed throughout the shooting. She said that after the first gunshot, the victim's "torso was on fire" and that the victim's hands were still bound by duct tape at this time. Ms. Hunt said that after the shooting ended, the Defendant dragged the victim's body to the embankment and threw it over the edge. Ms. Hunt said that although she, the Defendant, Mr. Clayton, and the unidentified woman left the home in the Defendant's car, she did not know where they went because she was "in a psychosis." She said, though, the Defendant "celebrat[ed]" afterward by smoking marijuana. She recalled that the Defendant sang and danced to music inside the car.

Ms. Hunt testified that the Defendant told her and Mr. Clayton to "dispose" of the victim's body and to clean the area where the shooting occurred. She said that ultimately, she got out of the car at Walgreens and left the area on foot. She said that she "ran for days" and hid under a house because she had witnessed the killing of her good friend. She identified photographs of the scene, including the couch on which the victim had slept while duct tape was placed on him. She identified the roll of duct tape recovered from the scene and stated it was consistent with the tape placed on the victim. She identified the photograph of the black sports bra that had been placed on the victim's head.

Ms. Hunt identified a photograph of the drag marks on the driveway and testified that the photograph depicted the victim's blood. She identified a photograph of the victim's body and said the Defendant placed the victim where the victim was found. She identified the laser for a firearm recovered from the scene and said the laser had been attached to the Defendant's firearm. Ms. Hunt stated that at the time of the shooting, she used opiates with the victim and Mr. Clayton.

On cross-examination, Ms. Hunt testified that she was at the home with Mr. Clayton and the victim around 4:50 a.m. and that someone contacted the Defendant, although she did not know who contacted him. She said that at some point after the shooting, she and Mr. Clayton spoke with an attorney before speaking to the police. She clarified that she was inside the car when "he" pulled the victim from the home and that she assumed the

victim's feet were bound with duct tape because the victim did not walk properly. She identified the surveillance recording from Walgreens, which was recorded after the shooting, and said that she walked away from the Defendant and Mr. Clayton at this time. She agreed the recording reflected that she wore flip flops but said she did not know if the shoes belonged to the victim.

Wanda Sharp testified that she owned the home where the shooting occurred, that she was home when the shooting occurred, and that she did not know about the shooting until the police informed her. She identified a cell phone found at the home as hers and said she consented to a forensic examination of the phone. She said that her son, Michael Clayton, used her phone frequently and that he possessed her phone in the early morning hours of August 29, 2017. Ms. Sharp did not know the Defendant, Ms. Hunt, and the victim. Ms. Sharp, likewise, did not know anyone was inside the home with Mr. Clayton when the shooting occurred.

On cross-examination, Ms. Sharp testified that she knew Ms. Hunt by the name Sierra. Ms. Sharp agreed that she spoke to Knoxville Police Investigator Charles Lee but denied telling Investigator Lee that Mr. Clayton had a firearm at the time of the shooting. She recalled telling the defense investigator that at an unspecified time, she looked out a window and saw Mr. Clayton and "a black guy" standing against the wall on the driveway.[3] She said that she did not see any weapons or anyone dead when she looked out the window. She agreed Mr. Clayton had not been charged criminally in connection with this case.

Deputy United States Marshal Paul Lieto from the Detroit Fugitive Apprehension Team testified that on September 20, 2017, his team apprehended the Defendant in Michigan. Marshal Lieto said that his office received information from Tennessee showing that the Defendant was at a hotel in Detroit. Marshal Lieto said he received surveillance recordings in order to identify the Defendant. Marshal Lieto said that after identifying the Defendant, he initiated a traffic stop and that the Defendant was taken into custody. A video recording of the traffic stop was played for the jury and received as an exhibit.

Marshal Lieto testified that during the traffic stop, he learned that the Defendant possessed a Glock .40-caliber handgun, which had an extended magazine clip with a twenty-two-round capacity. Marshal Lieto said that a shoestring was tied "through the bottom of the grip." He said that a second .40-caliber handgun was found inside the console for the vehicle.

Dr. Amy Hawes, an expert in forensic pathology, testified that she performed the victim's autopsy. She said that the victim sustained thirteen gunshot wounds to various

---

[3] Other evidence shows that the Defendant is black.

parts of the body, including the head, torso, pelvis, arms, and legs. She stated the bullet that struck the victim's head was fatal. She stated that the victim, likewise, suffered a fatal gunshot wound to the neck, which injured the spine and spinal cord. She said that this wound would have resulted in immediate death or incapacitation. She said that the gunshot wound to the abdomen was an intermediate range wound, which indicated that the gun was fired a few inches to a couple of feet from the victim. She said this wound was fatal, as well. She said that the gunshot wound to the chest caused multiple injuries to the lungs, esophagus, and trachea and that the wound was fatal. The remaining wounds were sustained to the shoulder, arms, hands, and thighs. She said that one of the bullets did not exit the victim's body, that the bullet fractured the femur, and that she recovered the bullet from the hip. She agreed that if the victim was heard screaming, the gunshot wound to the neck was not the first injury. She said that wounds to the victim's hands could indicate that the victim's hands were bound.

Knoxville Police Investigator Philip Jinks testified that he examined Ms. Sharp's cell phone. He said his review of Facebook Messenger showed that on the morning of the shooting, between 4:56 and 5:21 a.m., Mr. Clayton exchanged messages with someone named "Jay Skoop." Investigator Jinks said that the profile photograph associated with Jay Skoop depicted the Defendant and that the message exchange was the last before the shooting occurred. The messages reflect that Jay Skoop was "trapping," which Investigator Jinks explained meant selling drugs, that Mr. Clayton requested "two . . . for a fran," and that Jay Skoop requested Mr. Clayton's address. Investigator Jinks explained that they discussed heroin and methamphetamine.

On cross-examination, Investigator Jinks testified that Mr. Clayton and Trinidad James exchanged messages on the morning of the shooting and that the last message was sent at 5:44 a.m. Investigator Jinks was familiar with Mr. James as a result of Investigator Jinks's work in the narcotics division.

Michael Clayton testified that on August 29, 2017, he contacted the Defendant because he wanted to purchase drugs from the Defendant. Mr. Clayton admitted he had been addicted to drugs at the time of the shooting. He said that on the morning of the shooting, the victim and Ms. Hunt were at his home, that the victim had been at the home for three or four days, and that the victim had been a friend. Mr. Clayton said that the victim was at the home "detoxing" and sleeping. Mr. Clayton said that the Defendant and an unidentified woman arrived at the home around 5:30 a.m., that the Defendant saw the victim, that the Defendant asked for the victim's name, and that Mr. Clayton provided the victim's name. Mr. Clayton said that the Defendant was not angry after the Defendant learned the victim's name.

Mr. Clayton testified that at some point, the Defendant mentioned that the victim had stolen a car belonging to the Defendant's friend. Mr. Clayton said that the Defendant asked the unidentified woman and Mr. Clayton to go to a convenience store but denied that the Defendant forced Mr. Clayton to go to the store. Mr. Clayton said that he purchased a cigar, chocolate milk, and duct tape and that he thought the duct tape might have been for the Defendant's car, although Mr. Clayton was unsure. Mr. Clayton said that he learned later the duct tape was to bind the victim's hands. Mr. Clayton denied knowing the Defendant intended to bind the victim's hands. Mr. Clayton denied owning a firearm at the time of the shooting and said the Defendant had two firearms. Mr. Clayton said that the Defendant had a black Glock .40-caliber handgun with an extended magazine and that the Defendant likewise had a silver pistol. Mr. Clayton identified the Glock .40-caliber handgun recovered by Marshal Lieto at the time of the Defendant's arrest in Michigan as the firearm used by the Defendant to kill the victim. Mr. Clayton recalled that the handgun looked like a police-issued firearm and hung from the Defendant's neck.

Mr. Clayton testified that after he and the unidentified woman returned from the convenience store, the Defendant was upset and was displaying his handgun. Mr. Clayton said the Defendant woke the victim by striking the victim on the head with the handgun. Mr. Clayton recalled that the Defendant began "by putting a gun to [the victim's] head and aiming it all over his body and just like a predator would do his prey." Mr. Clayton could not recall the Defendant's statement but said the Defendant was "taunting" the victim. Mr. Clayton said that the Defendant's handgun "was out," that the Defendant told Mr. Clayton to bind the victim's hands with the duct tape, and that Mr. Clayton complied. Mr. Clayton said that he was scared, that he bound the victim's hands "as loose as possible," and that he told the victim to be careful because Mr. Clayton did not know what was going to happen. Mr. Clayton said that the Defendant grabbed the victim, placed "some sort of shirt" on the victim's head, and walked the victim outside the home. Mr. Clayton identified the black sports bra as the item placed on the victim's head.

Mr. Clayton testified that he walked outside behind the Defendant and the victim. Mr. Clayton said that Ms. Hunt and the unidentified woman were inside the Defendant's car. Mr. Clayton said that the Defendant attempted to place the victim inside the Defendant's car, that the victim was able to free his hands from the duct tape, that the victim and the Defendant struggled, and that the Defendant began shooting the victim. Mr. Clayton said that the Defendant placed the handgun to the victim's stomach and that "the first shot come out like about a two foot fireball out of [the victim's] back, and [the victim] was screaming and fell to get away from [the Defendant]." Mr. Clayton said that the victim raised his hands "to try to stop" the Defendant but that the Defendant shot the victim at least fifteen times. Mr. Clayton said that the victim stopped screaming after the fifth or sixth shot.

Mr. Clayton identified the roll of duct tape recovered at the scene as the tape he purchased at the convenience store. He said that when the Defendant taunted the victim, the Defendant used a laser mounted to the Defendant's handgun. Mr. Clayton stated that after the shooting, the Defendant "tried to hide" the victim by "dragging [the] body around the car and throwing [the body] into [the] woods." Mr. Clayton recalled that the Defendant dragged the victim's body by the duct tape that had bound the victim's hands and "threw" the victim down the embankment. Mr. Clayton said that after the Defendant disposed of the victim's body, the Defendant "took" everyone with the Defendant. Mr. Clayton denied that he entered the Defendant's car voluntarily and said the Defendant made two stops before dropping "us" off near Mr. Clayton's home. Mr. Clayton recalled that the Defendant celebrated killing the victim, that the Defendant turned up the music inside the car, and that the Defendant told Mr. Clayton to pour bleach on the driveway, to burn the leaves on the ground, and to bury the victim. Mr. Clayton said that the Defendant was going to purchase items to do these things at Walgreens but that the Defendant ultimately did not make any purchases. Mr. Clayton reviewed the surveillance recordings from Walgreens and identified himself and the Defendant in the recordings. Mr. Clayton said that the Defendant intended to purchase bleach but ultimately bought cigarettes. Mr. Clayton said that he "was scared out of [his] mind" and that "we just ran."

Mr. Clayton testified that he eventually spoke to attorney Mike Whalen and to the police. Mr. Clayton denied that he assisted the Defendant and said that he did not have a reason to kill the victim. Mr. Clayton identified the Facebook messages exchanged between Mr. Clayton and Jay Skoop and said the Defendant was known by the name "Skoops." Mr. Clayton admitted that he contacted the Defendant on the morning of the shooting in order to purchase heroin.

Mr. Clayton testified that the Defendant said the unidentified woman accompanying the Defendant possessed the silver handgun. After reviewing the Pilot convenience store surveillance recordings, Mr. Clayton said the woman in the recording was the unidentified woman who went with him to the store and who possessed the silver handgun.

On cross-examination, Mr. Clayton testified that he had known the victim for about one year, that they "hung out and got high" once or twice per month, and that he had met the victim's girlfriend. Mr. Clayton said that he met the Defendant in the spring of 2017 and that they saw each other frequently. Mr. Clayton said that he had known Ms. Hunt two or three years at the time of the shooting and that they had been friends. Mr. Clayton said that the Defendant asked him to obtain a firearm for the Defendant and that Mr. Clayton might have asked the Defendant to do the same. Mr. Clayton identified Trinidad James as Mr. Clayton's former girlfriend's boyfriend. Mr. Clayton agreed that he sent Mr. James a Facebook message on August 29, 2017, at 5:44 a.m., stating, "I got you a piece." Although Mr. Clayton did not recall the context of the message, Mr. Clayton agreed he could have

been referring to a weapon. He said, though, he could have been referring to a woman. He said he did not give anyone a weapon on August 29.

Alexis Godwin testified that she and the Defendant were friends at the time of the shooting and that they had a "physical" relationship. She did not know the victim but said she met Ms. Hunt and Mr. Clayton sometime before the shooting. Ms. Godwin said that the Defendant's Facebook profile name was Jay Skoop, that she looked for the Defendant's Facebook account after the shooting, and that the messages they had exchanged were gone. She said that the Defendant carried more than one handgun but recalled that he carried a black handgun with an extended magazine. She said that she only saw the Defendant carry the handgun as part of a necklace in photographs on Facebook, not personally.

Ms. Godwin testified that the Defendant came to her home around 9:00 p.m. on August 28 and that he left in her car around 10:00 p.m. She said that she and a woman known as "Ray" were at Ms. Godwin's home while the Defendant was gone. She said that the Defendant went to Detroit at an unspecified time and that Ray was with him when he returned to Tennessee. Ms. Godwin said that in the morning hours of August 29, she needed her car in order to attend a court hearing. She recalled that she drove a black Chevy Cruze at this time and said that the front passenger-side bumper was damaged during the Defendant's trip to Detroit.

Ms. Godwin identified an exchange of Facebook messages between herself and the Defendant on August 29, 2017, beginning at 9:50 a.m. She said that the Defendant sent her a message at 9:53 a.m. stating, "Lex, I got [the victim]." On cross-examination, Ms. Godwin stated that the Defendant returned her car on August 29, that they did not discuss the message, and that the Defendant did not mention being involved in a shooting.

Knoxville Police Officer Josh Smith testified that he analyzed the Defendant's two cell phones recovered at the time of the Defendant's arrest. Officer Smith said that on the phones, he found video recordings of the Defendant in possession of a firearm. Officer Smith explained the contents of the recordings as each was played for the jury. Officer Smith stated the first recording showed a small dog lying on the floorboard of a vehicle beside a Glock handgun and that the handgun "resemble[d] the murder weapon." Officer Smith stated that the recording was created on August 22, 2017, which was seven days before the shooting. Officer Smith stated the second and third recordings, which were created on September 12, 2017, and September 7, 2017, respectively, showed the Defendant in possession of the Glock handgun.

Officer Smith identified multiple text messages retrieved from the Defendant's cell phone and testified that on August 31, 2017, beginning at 4:05 p.m., the Defendant's phone was used to send a message stating, "I think Lex trying to snitch," and "She is trying to figure out too much about [the victim]." The Defendant's phone sent an additional message

stating, "She had Billy pull it up on Facebook." Officer Smith identified the phone number but could not recall the recipient's identity.

Knoxville Police Sergeant Brian Dalton, forensic firearm expert, testified that he analyzed the Glock firearm recovered at the time of the Defendant's arrest, the twenty-two .40-caliber bullets from the Glock's magazine, and the thirteen cartridge casings found at the scene of the shooting. Sergeant Smith stated that, based upon his analyses, the cartridge casings found at the scene were fired from the Glock recovered at the time of the Defendant's arrest. Sergeant Smith's report was received as an exhibit.

Former Knoxville Police Investigator Charles Lee testified that he was the lead investigator in this case, although he was employed by the District Attorney General's Office as a criminal investigator at the time of the trial. Mr. Lee stated that he responded to the scene, that he spoke to Ms. Sharp, that Ms. Sharp said Mr. Clayton had been using her cell phone, and that Ms. Sharp allowed Mr. Lee to examine the phone. Mr. Lee said that he found communications between Mr. Clayton and Jay Skoop on the phone, that he searched social media for anyone using the name Jay Skoop, and that he found a Facebook profile for Jay Skoop. Mr. Lee determined, based upon the content of the Facebook page, that Jay Skoop was from Detroit, Michigan, although some photographs on the Facebook page were taken in Knoxville, Tennessee.

Mr. Lee testified that he interviewed Mr. Clayton and Ms. Hunt, who provided consistent accounts of the shooting and who identified the Defendant as the shooter. Mr. Lee obtained the Defendant's Facebook records, which were received as an exhibit. Mr. Lee identified video recordings contained in the Facebook records, which were played for the jury. Mr. Lee stated that the video recordings, in relevant part, reflected a firearm with an extended magazine and that this firearm was consistent with the firearm recovered at the time of the Defendant's arrest.

On cross-examination, Mr. Lee testified that the second phone, which did not belong to Ms. Sharp and which was found inside the basement, had not undergone a forensic analysis. Mr. Lee agreed that only the bullet casings, bullet fragments, and the firearm were analyzed in this case and that the remaining items recovered from the scene were not analyzed. Mr. Lee clarified that the duct tape was analyzed for fingerprints but that none were found. Mr. Lee agreed that a fingerprint belonging to Channing Mendez was found on a "bottle" at the scene of the shooting. Mr. Lee said that he spoke to Mr. Mendez and that Mr. Lee determined many people frequented the home, which Mr. Lee described as "a drug den."

Upon this evidence, the jury convicted the Defendant of first degree premeditated murder, first degree felony murder during the perpetration of a kidnapping, especially aggravated kidnapping, and employing a firearm during the commission of a dangerous

felony.  The trial court merged the felony murder and premediated murder convictions and imposed a life sentence.  After a sentencing hearing, the trial court imposed an effective sentence of life plus thirty-one years.  This appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. He asserts, generally, that the State failed to establish his intent during the offenses.  He likewise argues relative to the especially aggravated kidnapping conviction that the victim was minimally bound and capable of walking without assistance and that any confinement "was perhaps incidental to some other unknown purpose."  The State responds that the evidence is sufficient.  We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).  The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence.  *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two."  *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A.  First Degree Premeditated Murder

Relevant to this case, first degree premeditated murder is the unlawful, intentional, and premeditated killing of another.  T.C.A. § 39-13-202(a)(1).  In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death.  *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2018) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result").  A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the

accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Factors from which a jury may infer premeditation include:

[D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

*State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

In the light most favorable to the State, the evidence shows that on the morning of the shooting, the Defendant arrived at Mr. Clayton's home to deliver drugs at Mr. Clayton's request. The Defendant saw the victim asleep on a couch and asked Mr. Clayton for the victim's name. After the Defendant learned the victim's name, the Defendant, who wore a .40-caliber Glock handgun with an extended magazine around his neck, instructed Mr. Clayton and an unidentified woman who accompanied the Defendant to go to a convenience store to purchase duct tape. Mr. Clayton and the unidentified woman complied, and surveillance recordings and a receipt from a Pilot convenience store reflects that duct tape was purchased near the time of the shooting.

While Mr. Clayton and the unidentified woman were away from the home, the Defendant "taunted" the victim, who lay asleep on the couch, with the laser attached to the handgun. Ms. Hunt could not recall the Defendant's specific words but recalled the Defendant's saying something "like eeny, meeny, miny, Jones" while pointing the laser "back and forth." Ms. Hunt and Mr. Clayton testified that the Defendant believed the victim had stolen a vehicle from the Defendant's friend.

After Mr. Clayton and the unidentified woman returned with the duct tape, the Defendant displayed the handgun and ordered Mr. Clayton to bind the victim's hands with the tape while the victim slept. Although the victim awoke when the Defendant struck the victim with the firearm and when Mr. Clayton loosely bound the victim's hands with the

-12-

duct tape, the Defendant began "putting a gun to [the victim's] head and aiming it all over his body and just like a predator would do his prey." The Defendant pulled the victim from the couch, placed a black sports bra on the victim's head, and led the victim outside the home. Ms. Hunt recalled that the victim's mouth was initially covered with duct tape but removed before the shooting. Before the shooting, Ms. Hunt heard the Defendant speak to the victim and the victim beg for his life. Mr. Clayton testified that the Defendant attempted to place the victim in the car, that the victim partially freed his hands from the duct tape, that the victim and the Defendant struggled, and that the Defendant began shooting the victim. The Defendant fired the handgun into the victim's stomach. The Defendant continued firing at the victim, who sustained thirteen gunshot wounds, four of which were fatal. A forensic firearm analysis reflected that the cartridge casings found at the scene were fired from the .40-caliber Glock handgun with an extended magazine recovered at the time of the Defendant's arrest.

After the shooting, the Defendant dragged the victim's body away from the home and threw the victim's body down an embankment, which was supported by photographs of the scene. The Defendant, the unidentified woman, Mr. Clayton, and Ms. Hunt left the home in the car being driven by the Defendant. The Defendant had borrowed Ms. Godwin's black Chevy Cruze. The Defendant was seen "celebrating," smoking marijuana, and singing and dancing to music inside the car. Later, the Defendant instructed Mr. Clayton and Ms. Hunt to dispose of the victim's body and to use bleach to clean the victim's blood from the driveway where the shooting occurred.

Likewise, hours after the shooting, the Defendant and Alexis Godwin exchanged Facebook messages and the Defendant stated, "Lex, I got [the victim]." The Defendant fled the jurisdiction to Michigan, where he remained until he was apprehended approximately three weeks later on September 20, 2017.

We conclude that the jury could have determined beyond a reasonable doubt that the Defendant acted with the conscious objective to cause the victim's death and that the Defendant's conduct resulted in Mr. Johnson's death. The evidence also supports the jury's determination that the Defendant acted with premeditation. Therefore, the evidence is sufficient to support the Defendant's conviction. He is not entitled to relief on this basis.

## B.    Especially Aggravated Kidnapping

Tennessee Code Annotated section 39-13-305(a) provides that "[e]specially aggravated kidnapping is false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon or by the display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere with the other's liberty." *Id.* § 39-13-302(a). In *State v. White*, our supreme court held that "whether

-13-

the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law." 362 S.W.3d 559, 577 (Tenn. 2012) (internal citations omitted). Trial courts have the obligation to provide clear guidance to the jury with regard to statutory language and must "ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* at 578.

The trial court instructed the jury as follows:

Although the law requires no specific period of time of confinement or distance of removal, a removal or confinement interferes substantially with another's liberty if the time of confinement is significant or the distance of removal is considerable.

To find the defendant guilty of the offense, you must also find beyond a reasonable doubt that the removal or confinement was to a greater degree than that necessary to commit the offense of murder as charged in count two. In making this determination you may consider all the relevant facts and circumstances of the case including but not limited to the following factors:

(a) the nature and duration of the alleged victim's removal or confinement by the defendant.

(b) whether the removal or confinement occurred during the commission of the separate offense.

(c) whether the interference with the alleged victim's liberty was inherent in the nature of the separate offense.

(d) whether the removal or confinement prevented the alleged victim from summoning assistance, although the defendant need not have succeeded in preventing the alleged victim from doing so.

(e) whether the removal or confinement reduced the defendant's risk of detection although the defendant need not have succeeded in this objective; and

(f) whether the removal or confinement created a significant danger or increased the alleged victim's risk of harm independent of that posed by the separate offense.

-14-

Unless you find beyond a reasonable doubt that the alleged victim's removal or confinement exceeded that which was necessary to accomplish the murder alleged in count two and was not essentially incidental to it, you must find the defendant not guilty of especially aggravated kidnapping and/or any lesser included offense.

The Defendant does not argue that the trial court failed to provide the *White* instruction, as required by law. The Defendant argues, rather, that any confinement "was perhaps incidental to some other unknown purpose." However, the jury was properly instructed relative to *White* and determined after considering all the evidence that the victim's confinement or removal exceeded that which was necessary to accomplish premediated murder.

We conclude that the evidence is sufficient to support the Defendant's especially aggravated kidnapping conviction. In the light most favorable to the State, the Defendant ordered Mr. Clayton to bind the unarmed victim's hands with duct tape as the victim lay asleep on the couch inside the home. The Defendant struck the victim with the .40-caliber Glock handgun in order to wake the victim. The Defendant taunted the victim with the handgun, placed a black sports bra on the victim's head, and forced the victim outside of the home at gunpoint. The Defendant attempted to place the victim inside the car, but the victim was able to free himself from the duct tape binding his hands. The Defendant and the victim struggled, and the Defendant fired the handgun thirteen times at the victim. A rational jury could have concluded beyond a reasonable doubt that the Defendant committed the offense of especially aggravated kidnapping. The Defendant is not entitled to relief on this basis.

## C.     First Degree Felony Murder

As relevant to the present case, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping[.]" T.C.A. § 39-13-202(a)(2) (2018). Kidnapping is defined as false imprisonment, as defined in § 39-13-302, under the circumstances exposing the other person to substantial risk of bodily injury." *Id.* § 39-13-303(a). False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere with the other's liberty." *Id.* § 39-13-302(a).

Because the evidence is sufficient to support the Defendant's conviction for especially aggravated kidnapping and because the evidence shows that the Defendant killed the victim during the perpetration of a kidnapping, the evidence is likewise sufficient to support his felony murder conviction. The Defendant is not entitled to relief on this basis.

**D.      Employing a Firearm During the Commission of a Dangerous Felony**

"It is an offense to employ a firearm during . . . [t]he commission of a dangerous felony.  *Id*. § 39-17-1324(b)(1).  Especially aggravated kidnapping is a dangerous felony. *See id*. § 39-17-1324(i)(1)(E).

Because the evidence is sufficient to support the Defendant's especially aggravated kidnapping conviction and because the evidence shows he used a firearm to commit the offense, the evidence is likewise sufficient to support his employing a firearm during the commission of a dangerous felony conviction.  *See id*. § 39-17-1324(i)(1)(B).   The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE